IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## WESTERN DIVISION.

JACKSON, APRIL TERM, 1895.

---

INSURANCE CO. *v.* LAUDERDALE.

(*Jackson.* April 11, 1895.)

LIFE AND ACCIDENT INSURANCE. *Misstatement in application.*

If assured falsely states, in his application for a life and accident policy, that his "habits are correct and temperate," and the truth of that statement is warranted and made the basis of the contract of insurance, and a conditon precedent to the validity of the policy, the policy is void, and it is not essential, in

Insurance Co. v. Lauderdale.

such case, "that the misstatement must be willful and intentionally made and known at the time to be false."

Case cited and approved: Boyd v. Insurance Co., 90 Tenn., 215; 6 Fed. Rep., 672; 90 Pa. St., 118.

FROM TIPTON.

Appeal in error from Circuit Court of Tipton County.    Thos. J. Flippin, J.

C. B. Simonton and J. C. Boales for Insurance Company.

G. W. Smitheal, N. W. Baptist, and Peyton J. Smith for Lauderdale.

McAlister, J.    This is a suit upon a policy of accident insurance issued by the plaintiff in error upon the life of Munford Lauderdale, and made payable, in the event of his death, to his wife, Mrs. Jessie Lauderdale.    The indemnity provided by the contract of insurance was against injuries happening to the insured from external, violent, and accidental means, which, in case of temporary disability or permanent misadventure, was to be apportioned according to a graduated scale; but, in the event such injuries resulted in death, the whole principal of $2,000 became payable.

The said Munford Lauderdale resided in Covington, and, on the night of March 21, 1893, during the absence of the other members of the family,

the residence caught fire, and, in the conflagration, the said Munford was burned to death.

The policy of insurance recites that it is issued in consideration of the warranties in the application, etc. The application, which was signed by the said Munford Lauderdale, stipulates that the statement of facts therein made are warranted to be true, and, if found untrue in any respect, the policy shall be void. It further recites that the application and warranty shall constitute the basis of the contract between the insured and the company. Among other statements made in said application, it recites that applicant's habits of life are correct and temperate. The policy itself provides that it shall not cover any injury happening to the insured when intoxicated, or in consequence of his being or having been under the influence of any narcotic or any intoxicating drink whatsoever. It is further stipulated in the policy that the injury must be produced by external, violent, and accidental means, independently of all other causes.

The insurance company resisted any liability in this case upon three grounds, to wit:

*First.*—That the said Munford Lauderdale falsely represented in his application that his habits of life were correct and temperate.

*Second.*—That the fatal injury happened to the insured when he was intoxicated, and this fact exempts the company from liability under the express stipulations of the policy.

*Third.*—That the death of the insured occurred in consequence of his being, or having been, under the influence of intoxicating drink, which fact, under the conditions of the policy, exonerates the company from liability.

It appears from the record that the said Lauderdale, at the time of the accident, was in the employment of C. O. & S. W. R. R. Co. as repairer of its telegraph line. He had spent the day in Memphis, returning to Covington about seven o'clock in the evening. There was evidence tending to show that deceased spent most of that evening in several saloons of the town of Covington, and imbibed to such an extent that the barkeepers, seeing his condition, declined to sell him more liquor. At a late hour he was persuaded by one Campbell to go home, the latter accompanying him. Reaching home, Lauderdale. unchained a favorite bull dog, which followed him to his bedroom. Campbell states that he then played on the violin for the amusement of Lauderdale and the dog. This witness testified that he considered Lauderdale, on the night of March 20, 1892, under the influence of whisky to some extent, but not drunk, or unable to take care of himself; that deceased would not let witness take hold of his arm when they were going home, for fear someone would say he (Lauderdale) was drunk. Witness went home with Lauderdale at the request of Carey Hill, Lauderdale's brother-in-law. At first Lauderdale refused to go, but afterwards consented to go.

Lauderdale asked witness to get him some whisky, as he might need it next morning. Witness got a pint of cocktail of Don H. Smith for Lauderdale. While witness and Lauderdale were at the house, witness told Lauderdale he did not get any whisky for him, but Lauderdale afterwards found the bottle on the mantelboard, and, as witness was about leaving, Lauderdale took a mouthful from the bottle, but spit it out and said he did not like it. Lauderdale started to go back to town when witness left, but when witness told him most people had gone to bed, he went back up the steps. Campbell left the house about twelve o'clock, leaving Lauderdale alone with his dog. A coal oil lamp, which had been lighted by Campbell and placed on a table, was still burning. Sometime between twelve and one o'clock the house was discovered to be on fire. A witness who reached the fire early, saw a person in the room he took to be Lauderdale. The body was lying on the floor with the face downwards. The fire was then all through the room. The next morning the remains were found charred and indistinguishable. A pair of iron pliers, which Lauderdale always carried, were found near the remains; also a key ring, a rim of a pocketbook, pants buttons, and two buckles. The remains of the dog were found within five or six feet of the body. It was by these means that the body of Lauderdale was identified.

There was a verdict and judgment in favor of

the plaintiff below for $2,133. The insurance company appealed, and has assigned errors. The first assignment is based upon the concluding portion of the following instruction to the jury:

On the question of warranties in the insured's application for the policy, His Honor charged as follows: " It is now claimed that the statement subscribed by the deceased, Munford Lauderdale, to the effect that his habits of life were correct and temperate, was untrue, and, by the express terms of the policy, render it null and void. In other words; it is claimed that his habit as to drinking was not temperate; that he was at that time, and prior thereto, addicted to drinking to excess, and in this particular his habit of life was not temperate. Now, if you find from the proof that, when this statement was made and this policy was issued, that statement in the application was not true, and the habits of said Lauderdale were not temperate, in the particular indicated, that would avoid the policy, and the plaintiff could not recover; but, to have this effect, the misstatement must be willful and intentionally made, and known at the time to be false.''

So much of the above charge as follows the word ''but,'' and to the end of the sentence, is assigned as error, to wit: ''That the misstatement must be willful and intentionally made, and known at the time to be false.''

We are of opinion this instruction was manifestly erroneous.

In the application referred to is the following statement: "I hereby apply for insurance against bodily injuries caused solely by violent, external, and accidental means, to be based upon the following statement of facts, all of which I hereby warrant to be true. If found to be untrue in any respect, then, in every such case the policy issued hereon shall be null and void."

Following the above, at division 11, letter *a*, is the following: "My habits of life are correct and temperate."

The closing paragraph of said application is in the words following: "I hereby agree that this application and warranty, together with all the premium paid [by] me, shall be the basis of the contract between the company and me, and I accept the policy which said company shall issue on this application, subject to all the conditions, provisions, and classifications contained in such policy or referred to therein, which I understand cannot be altered, changed, or waived by any agent of said company, either before or after the issuance thereof," and the same was signed by the insured, Munford Lauderdale.

"The substance of the decisions relating to the subject of warranty in insurance contracts is that the truth of all statements warranted to be true is a condition precedent to the liability of the insurer; for if the statements so warranted are untrue, there is no contract. Where the policy recites that the statements made in the application are warranted to

be true and are the basis of the contract, and that any misstatements in the application should make the policy void, the answers in the application are warranties." Bacon's Life Insurance, Sec. 194.

Says Mr. May, in his work on Insurance, viz.: "No particular form of words is necessary to constitute a warranty. Any statement or stipulation upon the literal truth or fulfillment of which in the intention of the parties the validity of the contract is made to depend, * * * amounts to a warranty. But no particular form of words will make a statement or stipulation a warranty, not even the use of the word 'warranty,' where it is apparent, from the context or from the other parts of the contract, that it is not the intention of the parties to make the validity of the contract depend on the literal truth or fulfillment of the statement or stipulation." May, Sec. 156.

We are of opinion that the statements made by the assured in his application for the policy, in respect to his habits, were not mere representations, but absolute warranties. Those statements were made in respect to a material matter that vitally affected the contract, and, if untrue, invalidated the whole insurance, whether the misstatement was willful and intentional or made through inadvertence. Indeed, in this view of the case, it is immaterial whether such statements be called representations or warranties. As stated by this Court in *Boyd* v. *Insurance Co.*, 90 Tenn., 215, "if, however, the rep-

resentation be of a fact material. to the risk, and be relied upon by the insurer, it is the undoubted general rule that such representation, whether made intentionally or through mistake and in good faith, avoids the policy." The materiality of the applicant's statement in respect to his habits on the subject of temperance will not be controverted. Applications for life and accident insurance invariably contain questions bearing upon the habits of the applicant, especially in regard to the use of intoxicants. The use of intoxicating liquors and drunkenness are pernicious habits, tending to shorten life, and for this reason such risks are avoided by well-regulated life insurance associations. *Schultz* v. *Mutual Life Insurance Co.*, 6 Fed. Rep., 672; 90 Pa. St., 118. Accident insurance companies also avoid such risks, for the reason that such indulgences render the assured incapable of discerning danger, and especially incapacitate him for avoiding its consequences after it is discovered. The statement, therefore, of the applicant in this case that his habits were correct and temperate, was most material to the risk, whether it be called a representation or a warranty, and, if untrue, it avoided the policy. It was, therefore, erroneous for the Court to charge "that, to have this effect, the misstatement must be willful and intentionally made, and known at the time to be false."

The judgment is reversed and the cause remanded for a new trial.